## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NANCY K.,

                Plaintiff,

      v.

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

Case No. 19 C 3137

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Nancy K. challenges the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Nancy seeks reversal and remand of that decision. The Commissioner has filed a motion for summary judgment asking the Court to affirm the ALJ's decision. For the following reasons, the Court agrees that a remand is necessary. The Commissioner's Motion for Summary Judgment [24] is therefore denied, and this case is reversed and remanded for further proceedings.

## BACKGROUND

Nancy alleged disability as of November 10, 2014 due to lumbar spinal stenosis, acquired spondylolisthesis, and lumbar degenerative disc disease. Nancy also suffers from sacroiliitis, left foot drop, major depressive disorder, emphysema, and osteoarthritis of her right knee and left wrist. On November 20, 2014, after failing conservative management treatment over an extended period of time, including chiropractic treatment, physical therapy, medications, and a series of epidural steroid lumbar injections, Nancy underwent a decompressive lumbar laminectomy and spine fusion from T7 to S1 at the age of 50. Her recovery was complicated by a left foot drop and pulmonary embolism. After her surgery, Nancy returned to work at a light duty position for a

short period in 2015. She started working again part-time at her sister's cross-stitch shop in December 2015. Nancy graduated from high school and has a commercial driver's license. She previously worked as a truck driver and as a personnel scheduler for a casino.

On July 16, 2018, ALJ Diane S. Davis issued a decision denying Nancy's DIB claim. (R. 15-27). Following the five-step sequential analysis, the ALJ found that Nancy had not engaged in substantial gainful activity since her alleged onset date of November 10, 2014 (step 1). *Id.* at 17-18. She identified degenerative disc disease of the lumbar spine, status post-fusion from T7 to S1, tendinitis of the left hip, De Quervain's syndrome of the left hand, bilateral carpal tunnel syndrome, and obesity as severe impairments (step 2). *Id.* at 18. Further, the ALJ determined that Nancy's mental impairment of major depressive disorder was not a severe impairment. *Id.* at 18-20. The ALJ then determined that Nancy's impairments did not meet or equal the severity of a list impairment (step 3). *Id.* at 20. The ALJ next found that Nancy retained the RFC to perform sedentary work except that she could: occasionally balance, stoop, and climb ramps and stairs; never kneel, crouch, crawl, or climb ladders, ropes or scaffolds; and frequently handle and finger bilaterally. *Id.* at 21-27. At step 4, the ALJ concluded that Nancy was able to perform her past relevant work as a scheduler. *Id.* at 27. Based on this step 4 finding, the ALJ found that Nancy was not disabled. *Id.* at 30. The Appeals Council denied Nancy's request for review on March 28, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-6; *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## DISCUSSION

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability

within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano*, 556 F.3d at 562; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 F. App'x 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and

conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

## DISCUSSION

Nancy challenges several aspects to the ALJ's decision. First, she claims that the ALJ erred in discounting the opinions of her treating orthopedic surgeon, Dr. Jerome Kolavo. Second, she argues that the ALJ reached an incomplete RFC by: ignoring evidence of her left foot drop, sacroiliitis, right knee and left wrist osteoarthritis, and emphysema; failing to adequately consider her depression; and failing to adequately account for her hand and wrist symptoms in finding that Nancy can perform frequent manipulation. Third, Nancy asserts that the ALJ improperly assessed her subjective symptom allegations. As to Nancy's first argument, the Court agrees that the ALJ did not provide good reasons, supported by substantial evidence, for the weight given to Dr. Kolavo's opinions. This error is enough to require remand of this case for further proceedings, and the Court does not consider Nancy's remaining challenges to the ALJ's decision. On remand, the ALJ may revisit these other aspects of her decision on a full record as appropriate.

Nancy argues that the ALJ failed to give appropriate weight to the opinions of her treating orthopedic surgeon, Dr. Kolavo. The treating physician rule requires the ALJ to give controlling weight to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2) (for claims filed before March 27, 2017). The opinions of a claimant's treating physician are generally "give[n] more weight" because he or she is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations,

4

such as consultative examinations." *Id*. An ALJ "must offer good reasons for discounting" the opinion of a treating physician. *Id*; *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Those reasons must be "supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016). "When an ALJ does not give a treating source's opinion controlling weight, then that opinion should be weighed based on the nature and extent of treatment, the treating source's area of specialty, and the degree to which the opinion is consistent with the record and supported by other evidence." *Gebauer v. Saul*, 801 F. App'x 404, 409 (7th Cir. 2020).

Dr. Kolavo's opinions are entitled to controlling weight unless unsupported and contradicted by other substantial evidence. Dr. Kolavo began treating Nancy on August 27, 2014 and performed an "extensive multilevel lumbar laminectomy along with thoracolumbar fusion from T7-S1 with iliac fixation" on November 20, 2014. (R. 540). After her surgery, Dr. Kolavo treated Nancy on eight occasions from December 9, 2014 through December 13, 2017. *Id*. at 483-84, 485-86, 487-88, 525-27, 540-41, 1020-21, 1131-32. The fact that Dr. Kolavo is an orthopedic surgeon and treated Nancy on multiple occasions for over three years weighed in favor of crediting Dr. Kolavo's opinion. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (The fact that "Dr. Tate is a psychiatrist" who "saw Scott on a monthly basis, and the treatment relationship lasted for over a year" "favor[ed] crediting Dr. Tate's assessment").

Dr. Kolavo offered several medical opinions between December 2016 and December 2017. (R. 193-195, 950-53, 1012, 1118-20). On December 20, 2016, Dr. Kolavo completed a Medical

Assessment. *Id*. at 950-53. Dr. Kolavo stated that Nancy suffers from lumbar spinal stenosis, acquired spondylolisthesis, degenerative disc disease, foot drop, and chronic pain, post fusion. *Id*. at 950. Her daily symptoms include back pain, chronic pain, weakness, fatigue, thigh pain, drop foot, decreased mobility, and hip pain. *Id*. at 950-51. Dr. Kolavo opined that Nancy's prognosis was "stable." *Id*. at 950. Dr. Kolavo cited to positive clinical findings of "left ankle and toe weakness" and "very limited lumbar range of motion (fusion)." *Id*. Dr. Kolavo indicated that Nancy's symptoms frequently interfere with her ability to perform simple work tasks and her medications cause her drowsiness/sedation. *Id*. at 951. As for specific functional abilities, Dr. Kolavo opined that Nancy: can walk one block without rest or severe pain or fatigue; can continuously sit for 30 minutes at one time and then needs to walk or stand; can stand continuously for 30 minutes and then needs to sit; can sit about two hours in an eight hour workday; can stand/walk about two hours in an eight hour workday; needs to take unscheduled breaks to rest six times during an average workday for ten minutes each before returning to work because of her fatigue and pain; can frequently lift less than ten pounds and occasionally lift ten pounds; and would be absent from work as a result of her symptoms and treatment for her symptoms about once or twice a month. *Id*. at 952-53. Dr. Kolavo "suggest[ed] part time work." *Id*. at 952. According to Dr. Kolavo, Nancy is unable to perform "consistent sitting or standing" or "fast paced tasks (e.g., production line)" and cannot be exposed to "work hazards (e.g., heights or moving machinery)." *Id*. at 951.

On April 12, 2017, Dr. Kolavo wrote a letter, stating Nancy "is under my care for low back pain associated with a spinal disorder, Arthrodesis, pain in thoracic spin[e], kyphosis, foot drop and left carpal tunnel syndrome." (R. 1012). Dr. Kolavo opined: "she is at a permanent sedentary work demand level." *Id*. According to Dr. Kolavo, Nancy's restrictions included no bending,

6

twisting, kneeling, squatting, climbing, or crawling and lifting no more than ten pounds with occasionally lifting twenty pounds. *Id*. Dr. Kolavo indicated: "Nancy must also have frequent (every 30 min) changes in position from sitting to standing." *Id*.

On December 13, 2017, Dr. Kolavo completed a long-term disability form for Sun Life Assurance Company of Canada. (R. 1118-20). Dr. Kolavo diagnosed Nancy with arthrodesis, low back pain associated with spinal disorder, pain in her thoracic spine, and kyphosis acquired. *Id*. at 1118. Dr. Kolavo opined that Nancy could: occasionally walk, sit, stand, push, pull, and reach above shoulder level; perform only negligible bending, squatting, climbing, twisting, balancing, kneeling, and crawling; frequently lift and carry 10 pounds and occasionally lift and carry twenty pounds; and drive a short distance. *Id*. at 1119. Dr. Kolavo indicated that Nancy would be limited to sedentary capacity work except that: (1) she is unable to sit for six hours in a workday; (2) she can only do part time work every other day; and (3) she needs to change positions from sitting to standing every 30 minutes. *Id*. at 1120.

The ALJ gave little weight to the opinions of Dr. Kolavo. (R. 25). The ALJ provided three main reasons for giving little weight rather than controlling weight to Dr. Kolavo's assessment of Nancy's functional limitations. First, the ALJ believed Dr. Kolavo's opinion that Nancy's condition declined over time from being limited to light work after her surgery in March and May of 2015 to being limited to sedentary work in November 2017 was unsupported by his own treatment notes which indicated that "x-rays showed stable findings and the claimant's ability to perform physical functions improved over time." *Id*. Second, the ALJ believed Dr. Kolavo's opinion that Nancy could perform only part-time work for four hours at a time was "at odds" with Nancy's current level of work at her sister's cross-stitch store for up to six hours at time when her sister is out of town. *Id*. Finally, the ALJ cited the opinions of the state agency reviewing

physicians, Drs. Kenney and Madison, and assigned them moderate weight but reduced Nancy's RFC to sedentary exertional activities with frequent handling and fingering bilaterally and no kneeling, crouching and crawling. *Id.*

The grounds provided by the ALJ for rejecting Dr. Kolavo's opinions that Nancy needs to change positions every 30 minutes and cannot sit for six hours in an eight-hour workday do not constitute good reasons. The ALJ first relied on x-rays which "showed stable findings." (R. 25). This is not a valid reason for rejecting Dr. Kolavo's opinions because "'stable' merely means that Plaintiff's condition is unchanged." *Vacco v. Colvin*, 2016 WL 738455, at *8 (N.D. Ill. Feb. 25, 2016). "Stable" does not shed any light on the nature and severity of a claimant's overall condition or her RFC. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' . . . does not necessarily mean that she is capable of doing . . . work."); *Hemminger v. Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008) ("a person can have a condition that is both 'stable' and disabling at the same time."); *see also Barnes v. Colvin*, 80 F. Supp.3d 881, 889 (N.D. Ill. 2015) ("'Stable' only signifies that Barnes' condition remained the same over a period of time. It does not address the level of what his condition was. Plaintiff could have been 'stable' and non-functional, or 'stable' and fully functional"). For example, a claimant could be in "terrible condition" immediately following a stroke" and still be characterized as "stable" by her doctor "if her condition had not changed over a period of time." *Murphy*, 759 F.3d at 819.

Here, the ALJ improperly equated stable x-ray findings with Nancy's overall orthopedic condition and an ability to engage in sedentary work, even though the term was used to describe the status of her postsurgical changes. As the ALJ referenced earlier in her decision, the "x-rays of claimant's lumbar spine taken after the claimant's surgery consistently showed stable-appearing

8

postsurgical changes." (R. 22, 483, 1132). In this context, stable means only that the postsurgical changes of the lumbar laminectomy with decompression spine fusion from T7 to S1 were unchanged in appearance from the previous x-ray. In fact, the December 13, 2017 x-ray finding cited by the ALJ also noted "[i]nstrumentation and fixation appears to be intact and unchanged in appearance compared to previous films." *Id*. at 1131. The fact that Nancy's postsurgical changes were stable does not signify that she was asymptomatic or that she was able to work full-time. In fact, on December 8, 2015, Dr. Kolavo considered Nancy's x-ray findings of stable postsurgical changes, but nevertheless opined that Nancy had "some residual radiculopathy accounting for some of her buttock and thigh pain and clearly some residual motor weakness" and recommended gabapentin. *Id*. at 540, 545.

Moreover, the ALJ did not provide the requisite explanation for why these x-ray findings of stable postsurgical changes undercut Dr. Kolavo's opinion that Nancy needs to change positions every 30 minutes and is unable to sit for a total of six hours in an eight-hour workday. *Vacco*, 2016 WL 738455, at *8 ("The ALJ never took the additional step to explain why the 'stable' condition undermines the treating physicians' opinions."); *see also Pettis v. Colvin*, 2016 WL 3226530, at *12 (N.D. Ill. June 13, 2016) (finding unpersuasive the ALJ's conclusion that a treating physician's note describing claimant as "stable" was inconsistent with his opinion that she suffers from a disabling mental condition). Further, the ALJ fails to cite to anything in the record regarding the significance, if any, of the fact that Nancy's postsurgical changes were stable. The ALJ was not free to substitute his own lay opinion about the significance of the x-rays' findings for that of a medical professional. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("No doctor every suggested that [claimant's 'unremarkable' MRI] meant anything about Moon's migraines."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (An ALJ "must not succumb to the temptation

to play doctor and make his own independent medical findings"). For these reasons, the ALJ's reliance on Nancy's "stable" postsurgical changes does not constitute a good reason for discounting Dr. Kolavo's opinions.

Also problematic is the ALJ's finding that Dr. Kolavo's treatment note findings that Nancy's "ability to perform physical functions improved over time" were inconsistent with his opinion that Nancy's "condition declined over time (e.g., limited to light work in March/May 2105, but limited to sedentary work in November 2017)." (R. 25). As Nancy explains, while she was released to "perform 'light duty' in March and May 2015, those restrictions reflected a tentative return to light duty relative to her previous job" as a truck driver, a medium exertion position. Doc. 17 at 7; (R. 27). Dr. Kolavo's light duty opinions were made in March and May 2015, when Nancy was still recovering from her spine surgery and attempting to return to work on a consistent basis. By July 2015, Nancy reported to Dr. Kolavo that was "doing a very light duty type of job at this point intermittently." Dr. Kolavo encouraged a "gradual normalization of activities within reason" and placed her off work for five months. (R. 526, 772). Nancy started working part-time again at her sister's shop in December 2015. *Id.* at 391. The ALJ characterized Nancy's two months of light-duty work after her spine surgery as an "unsuccessful work attempt" under 20 C.F.R. § 404.1574(c). *Id.* at 17. An unsuccessful work attempt is "work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment." 20 C.F.R. § 404.1574(a)(1). Thus, the ALJ found that Nancy left the light duty position because of her impairments. In this context, Dr. Kolavo's earlier opinion that Nancy could return to light work, is not inconsistent with Dr. Kolavo's subsequent finding after her unsuccessful work attempt that Nancy was limited to part-time sedentary work with a sit/stand option. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir. 2007) ("It does not follow from the fact that a claimant tried

to work for a short period of time and, because of [her] impairments, *failed*, that [s]he did not then experience pain and limitations enough to preclude h[er] from *maintaining* substantial gainful employment.").

The ALJ also found Dr. Kolavo's functional assessment inconsistent with his treatment notes, which showed Nancy's "ability to perform physical functions improved over time." (R. 25). Like evidence of stability, evidence of improvement does not necessarily negate Dr. Kolavo's opinions that Nancy nevertheless suffered from disabling functional limitations. "[I]mprovement is a relative concept and, by itself, does not convey whether or not a patient has recovered sufficiently to no longer be deemed unable to perform particular work on a sustained basis." *Martz v. Comm'r, Soc. Sec. Admin.*, 649 F. App'x 948, 960 (11th Cir. 2016). For instance, "one's medical condition could improve drastically, but still be incapable of performing . . . work." *Murphy*, 759 F.3d at 819. "The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled." *Id*.

In this case, substantial evidence fails to show improvement of Nancy's overall condition such that Dr. Kolavo's findings were not applicable. Rather, several of Dr. Kolavo's post-surgery treatment records demonstrate that Nancy experienced post-surgery improvement with her preoperative radicular pain, but she still suffered from residual symptoms, such as low back pain, left hip pain, and leg cramps, as a result her impairments. (R. 483) (3/3/2015 – Dr. Kolavo: "She has none of the radicular pain that she had prior to surgery," but "[s]he has low back and thoracic pain that comes and goes."); *id*. at 540 (12/8/2015 – Dr. Kolavo: Nancy's "low back is virtually painless but then goes on to describe some left hip girdle pain [,] some thigh pain and then what sounds like clear-cut musculoskeletal left hip pain" and finding "some residual radiculopathy accounting for some of her buttock and thigh pain and clearly has some residual motor weakness");

11

*id*. at 608 (5/5/2015 – Dr. Kolavo: "She has some left pelvic girdle pain and hip pain."); *id*. at 1020 (6/14/2017 – Dr. Kolavo: Nancy reporting that her preoperative radicular pain has resolved but she continues to experience intermittent bilateral low back and buttock pain, frequent leg cramping affecting both legs, the thighs and bilateral hamstrings, continued bilateral inguinal pain and tightness, chronic neck pain, and right biceps pain); *id*. at 1131 (12/13/2017 – Dr. Kolavo: Nancy report left low back pain and bilateral intermittent leg cramping "essentially unchanged from her previous visit."); *see also id*. at 527-30, 532-35, 536-39. What matters for purposes of determining Nancy's RFC is her overall state, not the mere fact that her preoperative radicular pain resolved. The ALJ's selective citations to Nancy's relative improvement in some areas is not, given the full record, a sound reason for refusing to give Dr. Kolavo's assessment controlling weight.

The ALJ failed to provide good reasons for discounting Dr. Kolavo's opinions by "cherry picking" evidence from Dr. Kolavo's treatment records to suggest that Nancy's physical functions improved to the extent that she could perform a full-time range of sedentary exertional work without a sit/stand option. The ALJ impermissibly focused on those portions of Dr. Kolavo's notes showing improvement in Nancy's functioning without fairly acknowledging contrary findings. None of the medical records cited by the ALJ, taken as a whole, provide sufficient grounds for rejecting Dr. Kolavo's opinions. For example, the ALJ cited Dr. Kolavo's progress notes from May 5, 2015 and December 8, 2015. (R. 25). The ALJ noted Dr. Kolavo's findings at those visits that: Nancy could beginning wean out of her lumbar brace over the next few weeks; she reports that her low back is "virtually painless;" she "stands [and] moves about the office without much difficulty;" she can "walk on toes but still has difficulty heel walking on the left;" and a neurologic exam showed normal motor strength in the lower extremities except for 4 over 5 left anterior fibrillation weakness and trace left extensor hallucis longus weakness. *Id*. at 22, 23, 540, 609.

However, according to the same December 8, 2015 progress note, Nancy described "some left hip girdle pain[,] some thigh pain and then what sounds like clear-cut musculoskeletal left hip pain[, which] emanates from her groin and sometimes encompasses the whole hip girdle." *Id*. at 540. Dr. Kolavo noted that Nancy had a hip joint injection which gave her temporary improvement. *Id*. Dr. Kolavo further noted that Nancy has "tenderness[,] clicking and popping with range of motion and has difficulty doing things like climbing with that left leg. She still has some subjective weakness in the leg." *Id*. He noted that she walked for exercise, had been in physical therapy for her hip, and sacroiliac injections had been suggested to her. On examination, Nancy had diminished internal rotation of the left hip with pain. *Id*. Dr. Kolavo recommended gabapentin (a nerve pain medication). *Id*. He discouraged injection therapies with regard to her spine or SI joint because he did not "want any needles anywhere near her instrumentation." *Id*. The ALJ should have at least mentioned these observations, which arguably support Dr. Kolavo's opinion that despite some relative improvement post-surgery in some areas, Nancy continued to struggle with left hip pain. The Seventh Circuit has criticized this very type of cherry-picking. *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("The ALJ considered only the signs of possible improvements in these notes and ignored the negative findings. But all findings in psychiatric notes must be considered, even if they were based on the patient's own account of her mental symptoms.") (internal citations omitted); *Campbell*, 627 F.3d at 306 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability.").

In support of his post-surgery improvement conclusion, the ALJ also cited to a physical therapist's report from February 13, 2017, where the physical therapist noted that after eight sessions, Nancy was "feeling better overall" and "been able to increase her activity level." (R. 25;

13

1009-1011). The ALJ noted that Nancy "reported improvement over 8 session of physical therapy." *Id*. at 23. Yet, the ALJ failed to mention that Nancy had only "intermittently" met her long term goal of being able to sit for one hour without needing to stand, which appears to support the sit/stand limitation suggested by Dr. Kolavo. *Id*. at 1011. The ALJ's failure to acknowledge this aspect of those same physical therapy notes which detracts from her analysis undermines her decision to discount Dr. Kolavo's opinion based on improvement. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has an obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

The ALJ also relied on Dr. Kolavo's indication on June 14, 2017 that Nancy "could resume bowling with a lighter ball," without explaining how bowling undercut Dr. Kolavo's opinion that Nancy must be allowed to change positions between sitting and standing every 30 minutes and cannot sit six hours of an eight-hour workday. (R. 25, 1021). Without further explanation, the Court cannot find that this constitutes a sound reason to discredit Dr. Kolavo's opinion concerning Nancy's need to alternate sitting and standing positions and her inability to sit for six hours. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (ALJ must build a "logical bridge form the evidence to the conclusion."). Once again, the ALJ cherry-picked from Dr. Kolavo's progress note, citing only evidence she believed supported her RFC. Dr. Kolavo's June 14, 2017 progress note also indicates that although her preoperative radicular pain had resolved, Nancy stated she continued to experience intermittent bilateral low back and buttock pain, frequent leg cramping which affects both legs, the thighs and bilateral hamstrings, chronic neck pain, and right biceps pain. (R. 1020). She reported continued bilateral inguinal pain and tightness which had improved since she started swimming in January 2017. *Id*. At that time, Nancy was taking cyclobenzaprine (a muscle

14

relaxant) nightly, daily diclofenac (a nonsteroidal anti-inflammatory) and gabapentin as well as Tylenol about twice a week for more intense pain. *Id.* Nancy reported that she was able to work in her sister's store about once a week or as needed but only because she was able to sit, stand and walk as needed. *Id.* Moreover, despite the relative improvement in Nancy's ability to resume bowling with a lighter ball, Dr. Kolavo nevertheless advised Nancy to "continue to work on weight reduction as a means to reduce pain." *Id.* at 1021. These additional facts support Dr. Kolavo's opinion that Nancy had ongoing symptoms of pain and needs to change positions every 30 minutes, but the ALJ improperly failed to acknowledge these facts. *Scott*, 647 F.3d at 740 (treating doctor's "notes show[ed] that although Scott had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia. The ALJ was not permitted to "cherry-pick" from those mixed results to support a denial of benefits.").

The ALJ next relied on a progress notes completed by Dr. Kolavo on December 13, 2017, the last visit to Dr. Kolavo in the record. (R. 25, 1132). On December 13, 2017, Nancy reported that her left low back pain and bilateral intermittent leg cramping remained unchanged since her visit on June 14, 2017 and she continued to take diclofenac twice daily and cyclobenzaprine at bedtime as well as Tylenol for more severe pain. *Id.* at 1131. The ALJ correctly noted that at that time: Nancy's gait was slow and wide-based with slight drop foot on the left, but she was able to toe walk on both feet; there was no tenderness to palpation of the thoracic and lumbar spine; and her lower extremity strength was 5/5 in all groups except the left EHL (3/5 strength) and left ankle dorsiflexion (4/5 strength). *Id.* at 25, 1131. It is not apparent, and the ALJ failed to explain, why these findings are inconsistent with Dr. Kolavo's finding that Nancy needs to alternate positions every 30 minutes and cannot sit six hours in a workday.

The ALJ emphasized the fact that Dr. Kolavo indicated at the December 2017 visit that Nancy "did not need to return for additional follow up for 3 years." (R. 23, 25, 1132). Nancy argues that the ALJ failed to explain why it was significant that Dr. Kolavo would not need to see her more frequently when her condition was not expected to change. The Court agrees. Dr. Kolavo treated Nancy over a span of three years and saw her at least eight times. After Nancy's spine surgery on November 20, 2014, the frequency of her visits with Dr. Kolavo slowly decreased. Dr. Kolavo described Nancy's condition as stable and permanent. *Id* at 950 (12/20/2016 – Prognosis is "stable"); *id*. at 1012 (4/12/2017 –"She is at a permanent sedentary work demand level."); *id*. at 1120 (12/13/2017 – "No recovery is expected."). While frequency of visits is one factor that an ALJ may consider in evaluating the weight to afford a treating physician's opinion, it is reasonable to conclude here that the reduction in visits to Dr. Kolavo was due to his specialty as an orthopedic surgeon and Nancy's unchanged condition. 20 C.F.R. § 404.1527(d)(2). Given Dr. Kolavo's specialty and the permanency of Nancy's condition, there was nothing further for Dr. Kolavo to do unless surgery was required again. Moreover, the ALJ cites nothing in the record showing the accepted frequency of visits for an orthopedic surgeon three years after surgery for a stable and permanent condition. The ALJ's suggestion that this frequency of visits suggests a lesser degree of limitation than Dr. Kolavo opined amounted to an independent medical finding without the support of an underlying medical opinion. *See, e.g., Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1096 (E.D.Wis.2001) (in the absence of evidence concerning how regularly a patient with the plaintiff's condition would be expected to see a doctor, the ALJ should not have made his own independent medical determination about the appropriate frequency of doctor visits). Thus, the Court finds that it was inappropriate, on this record, for the ALJ to conclude that fewer visits with Dr. Kolavo suggested that Nancy was less limited than as opined by Dr. Kolavo.

The second main reason offered by the ALJ for denying Dr. Kolavo's opinion controlling weight is also unavailing. The ALJ noted that Nancy testified to working for up to six hours at a time in her sister's cross-stitch store when her sister is out of town, which is "at odds with" Dr. Kolavo's opinion that Nancy can perform part-time work for four hours at a time. (R. 25, 952). This perceived conflict was not a good reason for declining to afford Dr. Kolavo's opinion controlling weight. The ALJ failed to consider that Dr. Kolavo's opinion of Nancy's physical abilities was based on a "competitive work situation on an ongoing basis," rather than on an as needed basis in her sister's store. *Id*. at 952. The record also does not demonstrate that Nancy performed her work activities on a sustained, full-time basis or without accommodation. The ALJ neglected to address the accommodations that allow Nancy to work part-time in her sister's shop, including her ability to alternate positions at will. Nancy testified that when she works at her sister's store, she can sit or stand as needed. *Id*. at 65. It is unclear how Nancy's ability to periodically work up to six hours a day with a sit/stand option reflects that she can work a full-time sedentary job without a sit/stand accommodation, and the ALJ failed to explain her decision in that regard. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Campbell*, 627 F.3d at 306 (7th Cir. 2010) (a decision denying benefits that "lacks an adequate discussion of the issues . . . will be remanded."). Having the ability to periodically work for six hours at a time in her sister's cross-stitch store with a sit/stand option is not in tension with Dr. Kolavo's opinions. As a result, this alleged inconsistency is not a good reason for declining to afford controlling weight to Dr. Kolavo's opinions either.

Third, and the most troubling aspect of the ALJ's analysis, is her purported reliance on the state agency physicians' opinions when giving little weight to Dr. Kolavo's opinion. (R. 25). Drs. Madison and Kenney found that Nancy could occasionally lift ten pounds and frequently lift less than ten pounds. *Id*. at 81, 93. They both opined that Nancy could stand and/or walk or sit about six hours in an eight-hour workday but "[m]ust periodically alternate sitting and standing to relieve pain and discomfort." *Id*. Dr. Madison and Kenney also limited Nancy to occasional postural activities. *Id*. at 82, 94. The ALJ explained that she gave "moderate weight" to the state agency physicians' opinions because they were "based upon the objective medical evidence of record" but further limited Nancy to sedentary work and included additional postural limitations of never kneeling, crouching, crawling, or climbing ladders, ropes or scaffolds based on Nancy's testimony that she had difficulties bending to dust low surfaces and used grabbers to pick up things off the floor or reach for things that are higher up in her home. *Id*. at 26. The ALJ added an additional limitation that Nancy can frequently handle and finger bilaterally. *Id*. at 21.

The ALJ purported to give "moderate weight" to the opinions of the state agency physicians with added postural and manipulative limitations, yet both of those sources assessed a sit/stand limitation. However, nothing in the ALJ's RFC accounted for Drs. Madison's and Kenney's finding that Nancy "must periodically alternate sitting and standing to relieve pain and discomfort." (R. 81, 93). Thus, the ALJ rejected the state agency physicians' opinions in that regard, but did so without any explanation. While the ALJ need not accept the full extent of Drs. Madison's and Kenney's opinions, she cannot reject a significant part of them without minimally articulating a reason, supported by substantial evidence. *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) ("While the ALJ was not required to follow Dr. Vincent's opinion, there is no indication in the record that she was even aware that a state agency physician—two, actually—

18

had opined that [claimant] had significant limitations with her hand, much less that she gave this opinion proper consideration."). This aspect of the ALJ's decision is erroneous because an ALJ must explain why a medical opinion that conflicts with an RFC assessment is not adopted. *Id*. (*quoting* SSR 96-6p) ("[W]hen the evidence comes in the form of a medical opinion from a state agency physician, the agency's own regulations and rules require that the ALJ 'not ignore these opinions and must explain the weight given to the opinions in their decisions.'")[1]; *see also* SSR 96–8p, 1996 WL 374184, at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

In addition, the contradictory opinion of Nancy's RFC provided by the state agency physicians does not justify discounting Dr. Kolavo's opinion that Nancy is unable to sit for six hours in an eight-hour workday. *Israel*, 840 F.3d at 437 ("A contradictory opinion on a non-examining physician does not, by itself, suffice as justification for discounting the opinion of the treating physician."); *Gudgel*, 345 F.3d at 470. While the ALJ did not rely on the state agency physicians' opinions alone to discount Dr. Kolavo's opinions, for the reasons explained above, the other evidence relied on by the ALJ is inadequate to justify the ALJ's rejection of Dr. Kolavo's opinion. Thus, substantial evidence does not support the ALJ crediting the state agency physicians' opinions that Nancy had the ability to sit for six hours in an eight hour workday over Dr. Kolavo's contradictory opinion.

The ALJ's decision to afford little weight to Dr. Kolavo's opinion that Nancy needs to change positions every 30 minutes is also flawed because it was well-supported by other evidence in the record, including a functional capacity evaluation. (R. 755-69); *see also id*. at 361-62. In

---

[1]       SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017. SSR 17-2 p, 2017 WL 1105349, at *15264 (March 27, 2017). Even under SSR 17-2p, ALJS are "not required to adopt prior administrative medical findings when issuing decisions," but they "must consider them and articulate how they considered them in the decision." SSR 17-2p, 2017 WL 1105349, at *15265.

June 2016, Nancy underwent a functional capacity evaluation with physical therapist Ahmed Hassan. *Id*. at 755-69.  On examination and testing, Nancy had restrictions in strength and range of motion of the lower extremities as well as restrictions in lumbar and thoracic rotation and bending both forward and side bending, secondary to her surgery and the posterior spinal fusion from T7 to S1. *Id*. at 765.  She had  positive left straight leg raising at 72 degrees and an antalgic gait pattern. *Id*. at 767.  Nancy was unable to reach full squatting and perform repetitive squatting. *Id*.  She failed to get up from a partial squatting position without holding onto a steady object to assist herself to stand. *Id*.  Based on testing, Hassan found that Nancy "was unable to sit for more than 25 minutes, stand more than 15 minutes, and walk for more than 20 minutes without needing to change position." *Id*. at 756, 769.  Hassan opined that the "overall results of the evaluation [were] considered valid, due to the consistent effort by [Nancy] during her performance of the functional activities throughout testing, and validity tests results performed within the FCE." *Id*. at 756.  Hassan concluded that Nancy's "current physical demand level is sedentary.  She has limitations in her ability to maintain one position for more than 25 minutes." *Id*. at 756.  Hassan's finding that Nancy has limitations in her ability to maintain one position for more than 25 minutes is similar to the opinion of Dr. Kolavo.

The ALJ stated that she gave partial weight to Hassan's opinion but found that "the totality of the evidence fails to establish that [Nancy] would require a special accommodation to change positions throughout the day, based upon the results of physical examinations, updated x-rays, and the claimant's recitation of her activities of daily living, among other factors."  (R. 24).  The ALJ did not explain, however, how the specific medical records she cited detracted from Hassan's opinion that Nancy is unable to maintain one position for more than 25 minutes. *Id*.  The ALJ relied on some of the same inadequate evidence as she did in discounting Dr. Kolavo's sit/stand

20

restriction opinion. *Id*. at 24, 540 (Dr. Kolavo's progress note dated 12/8/2015), 1020-21 (Dr. Kolavo's progress note dated 6/16/2017), 1131-32 (Dr. Kolavo's progress noted dated 12/13/2017). As explained above, these treatment records from Dr. Kolavo fail to contradict Hassan's opinion that Nancy is unable to maintain one position for more than 25 minutes.

The remaining records cited by the ALJ lend support to Hassan's opinion. In particular, in an Adult Function Report dated September 21, 2016, Nancy stated that she "engage[s] in a variety of activities alternating sitting and standing every 30 mins" and her household chores take "2-4 hours with breaks every 30 minutes." (R. 333-34). Nancy reported that she does her hobbies "no more than 30 min at a time" and "frequently change[s] positions (sit/stand) – about every 15-20 mins." *Id*. at 336. Additionally, the ALJ cites generally to Nancy's testimony but identifies no specific portion which is inconsistent with Hassan's finding that Nancy needs to change positions every 25 minutes throughout the day. In fact, Nancy testified that she "rotate[s] between sitting and standing" and that she is able to sit or stand as needed at her sister's cross-stitch shop. *Id*. at 61, 65. Dr. Kolavo's progress note dated June 14, 2017 cited by the ALJ also reflects that Nancy "is able to work in her sister's store about once a week, or as needed but only because she is able to sit, stand and walk as needed." *Id*. at 1020. The last record relied on by the ALJ in rejecting Hassan's opinion was from March 3, 2015, where Dr. Kolavo noted Nancy "has none of the radicular pain that she had prior to surgery." *Id*. at 483. This record from just three and half months after Nancy's surgery does not reflect Nancy's condition during most of the relevant time period and does not conflict with Hassan's FCE conclusions over a year later in June 2016. In the same note, however, Dr. Kolavo also wrote that but Nancy "has low back and thoracic pain that comes and goes." *Id*. An additional concern is that the ALJ gave moderate weight to the opinions of the state agency physicians who expressly considered Hassan's opinion and concluded that Nancy

"must periodically alternate sitting and standing to relieve and discomfort." *Id.* at 78, 79, 81, 87, 90, 91, 93. Given this record, the ALJ's articulated reasons for assigning light weight to physical therapist Hassan's opinion—which supported Dr. Kolavo's opinion that Nancy needs a sit/stand option every half hour—were not supported by substantial evidence.

The ALJ's errors in discounting Dr. Kolavo's opinions were not harmless. Harmless error occurs when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" because remanding would be "a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Here, the VE testified that a claimant's need for an unscheduled break of six minutes every hour would eliminate all employment opportunities at the sedentary exertional level. (R. 73). This is a sufficient indication that giving controlling or even partial weight to Dr. Kolavo's opinion that Nancy needs to alternate positions every thirty minutes could change the outcome. Moreover, a claimant's inability to sit for six hours during an eight-hour workday may limit her to less than sedentary work and could also change the result on remand. SSR 83-10, 1983 WL 31251, at *5 (1983) (for sedentary work, "sitting should generally total approximately 6 hours of an 8-hour workday.").

Accordingly, this case must be remanded for further consideration of Dr. Kolavo's opinions that Nancy needs a thirty-minute sit/stand option and is unable to sit for six hours in an eight-hour work. On remand, the ALJ shall properly consider and weigh Dr. Kolavo's treating opinions and then reevaluate Nancy's impairments and RFC, considering all of the evidence and testimony of record. The ALJ shall provide a more fulsome explanation as to why the evidence either supports Dr. Kolavo's limitations or warrants different ones. With the assistance of a VE,

the ALJ shall determine whether there are jobs that exist in significant numbers that Nancy can perform.

**<u>CONCLUSION</u>**

For the reasons stated above, the Commissioner's Motion for Summary Judgment [24] is denied and the ALJ's decision is reversed and remanded for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff Nancy K. and against the Commissioner.

**SO ORDERED.**

Dated: July 24, 2020

_____
Sunil R. Harjani
United States Magistrate Judge